UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| RONALD ENGLISH, individually and on behalf of all those similarly situated,<br><br>               Plaintiff,<br>v.<br><br>CCTS, LLC; CCTS CAPITAL, LLC; CRESTAR CAPITAL, LLC; CCTS TAX LIENS I, LLC; CCTS TAX LIENS II, LLC; M.D. SASS ASSOCIATES, INC.; M.D. SASS INVESTORS SERVICES, INC.; M.D. SASS MUNICIPAL FINANCE PARTNERS-III, LLC; M.D. SASS MUNICIPAL FINANCE PARTNERS-IV, LLC; M.D. SASS MUNICIPAL FINANCE PARTNERS-V, LLC; M.D.SASS MUNICIPAL FINANCE PARTNERS-VI, LLC; ISADORE MAY; RICHARD J. PISCIOTTA, JR.; STEPHEN E. HRUBY; ROBERT ROTHMAN; WILLIAM COLLINS; DAVID FARBER; ROBERT STEIN; ROYAL TAX LIEN SERVICES LLC; MICHAEL FABRIKANT & ASSOCIATES; INC.; ROYAL BANK AMERICA; ROYAL TAX LIEN SERVICES, LLC; ROYAL BANCSHARES OF PENNSYLVANIA, INC.; U.S. BANK N.A.,<br>               Defendants. | CIVIL ACTION NO.<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

This is a proposed Class Action brought by Plaintiff Ronald English (referred to herein as "Plaintiff") on behalf of himself and all other similarly situated property owners who had delinquent tax obligations on real property located in New Jersey purchased by any of the Defendants named herein at an interest rate greater than 0%. Plaintiff's claims are based upon personal knowledge as to his own acts, upon information and belief as to the acts of others, as set forth herein, and upon the investigation of Counsel. The majority of evidence in support of

Plaintiff's claims is in Defendants' exclusive possession, custody, or control.  Plaintiff's claims

as to Defendants' actions and conduct are likely to have evidentiary support after a reasonable

opportunity to take discovery.

## INTRODUCTION

1.      In New Jersey, all real property owners are required to pay, on a quarterly basis,

their respective municipal property taxes and/or charges for municipal services such as sewer

and water services.  When a property owner fails to make such payments, because, for example,

of financial hardship, New Jersey state law requires the municipality to sell the delinquent

obligation to an investor in an auction.

2.      At these auctions, bidders are able to bid on the liens by bidding the amount of

interest they will charge to the property owner.  The bids open at 18% interest and decrease

incrementally.  In a competitive environment, the interest rate is often bid down to zero and a

bidder may pay a premium to obtain the lien.  At the time of the sale, the winning bidder must

pay the outstanding lien, interest due, and any premium to the municipality.  The winning bidder

receives a Certificate of Sale, which must recorded to preserve the lien holder's interest and sent

to the property owner notifying him or her of the change in ownership of the lien.  These

certificates of sale entitle the lien holder to several benefits:  (a) a first priority lien on the

property, (b) penalties ranging from 2 to 6%, (c) interest on the delinquent tax obligation; (d) the

right to collect the delinquent tax obligation, and after a period of time, (e) the right to foreclose

on the property should the lien not be redeemed by the property owner.  As such, bidders have

incentives to purchase liens, even if they have to pay a premium to obtain the lien and the

interest rates are 0%.

3.      This case arises out of an unlawful conspiracy and agreement among Defendants and their co-conspirators to rig bidding at municipal tax lien sale auctions. Defendants' unlawful conduct had the purpose and effect of keeping tax lien interest rates at or close to the statutory cap of 18%, instead of permitting the competitive bidding that would have caused tax lien interest rates to sell with an associated interest rate as low as 0%. This conspiracy began on or about January 1998 and continued until the present. ("Class Period").

4.      Plaintiff's tax lien was purchased by Defendant CCTS Capital, LLC on November 25, 2008 from the Township of East Greenwich. On October 20, 2009, Plaintiff obtained a Lien Maintenance Statement from the lien holder. On that date, the redemption cost of Plaintiff English's $8,309.15 lien had increased substantially and significantly (including, among other things, 18% interest, fees and penalties).

5.      As a direct and proximate result of Defendants' unlawful conspiratorial bid rigging scheme, Plaintiff and other members of the Class have paid or are required to pay higher rates of interest to redeem the tax liens on their properties than they otherwise would have paid in a competitive market and have therefore been injured.

6.      Plaintiff brings this class action pursuant to Section 1 of the Sherman Act, 15 U.S.C. § 1, Section 16 of the Clayton Act, 15 U.S.C. § 26, the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68, the New Jersey Antitrust Act, N.J.S.A. 56:8-2, the New Jersey Racketeering Influenced and Corrupt Organizations Act, N.J.S.A. 2C:41-2(c) and for violations of the New Jersey common law.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, as the claims arise under the federal antitrust and RICO laws. This Court has supplemental jurisdiction over Plaintiff's state law claims.

6.      This Court also has original diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA").  Plaintiff and many members of the Class are citizens of different states than many of the Defendants.  The amount in controversy in this action exceeds $5,000,000, and there are more than 100 members in the proposed Class.

7.      In addition, this Court has diversity jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1332(a). The matter in controversy is greater than $75,000 and this matter is between citizens of different states. This Court has supplemental jurisdiction over Plaintiff's state law claims.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c), Sections 4 and 12 of the Clayton Act, 15 U.S.C. § 15 and 22, and 18 U.S.C. § 1965, because the Defendants reside in, are found in, have an agent in, and/or transact their affairs in the District of New Jersey where a substantial part of the events complained of occurred.

## PARTIES

9.      Plaintiff Ronald English is a citizen of New Jersey residing in Gloucester County.

10.     Defendant CCTS, LLC ("CCTS") is a New Jersey limited liability company with its principal place of business located at 1415 Route 70 East, Cherry Hill, New Jersey.  CCTS is in the business of purchasing tax liens as investment opportunities. According to its website, CCTS conducts business throughout the entire state.  During the Class Period, CCTS purchased tax sale certificates in New Jersey and knowingly participated in the conspiracy alleged herein.

11.     Defendant CCTS Capital, LLC was a New Jersey limited liability company with its principal place of business located at 1415 Route 70 East, Cherry Hill, New Jersey. During the Class Period, CCTS Capital, LLC purchased tax sale certificates in New Jersey and knowingly participated in the conspiracy alleged herein. In 2008, Defendant Crestar Capital LLC became the successor company to CCTS Capital.

12.     Defendant Crestar Capital LLC is a Delaware limited liability company with its principal place of business located at 1415 Route 70 East, Cherry Hill, New Jersey. Crestar Capital was incorporated in 2008, and is the successor company to CCTS Capital, LLC.

13.     Defendant CCTS Tax Liens I, LLC ("CCTSI") is a New Jersey limited liability company with its principal place of business located at 1415 Route 70 East, Cherry Hill, New Jersey. During the Class Period, CCTS Tax Liens I, LLC purchased tax sale certificates in New Jersey and knowingly participated in the conspiracy alleged herein.

14.     Defendant CCTS Tax Liens, II, LLC (CCTSII) is a limited liability company with its principal place of business located at 1415 Route 70 East, Cherry Hill, New Jersey. During the Class Period, CCTS Tax Liens II, LLC purchased tax sale certificates in New Jersey and knowingly participated in the conspiracy alleged herein.

15.     Defendant M.D. Sass Associates, Inc. is a Delaware corporation with its principal place of business located in New York City, New York. During the Class Period, M.D. Sass Associates, Inc., actively and knowingly participated in the conspiracy alleged herein, colluded with others to fix tax lien interest rates, and purchased tax sale certificates in New Jersey.

16.     Defendant M.D. Sass Investors Services, Inc. is a Delaware corporation with its principal place of business located in New York City, New York. During the Class Period, M.D. Sass Investor Services, Inc., actively and knowingly participated in the conspiracy alleged

herein, colluded with others to fix tax lien interest rates, and purchased tax sale certificates in New Jersey.

17.     Defendant M.D. Sass Municipal Finance Partners –III, LLC, is a Delaware limited liability company with its principal place of business in New York, New York.  During the Class Period, M.D. Sass Municipal Finance Partners – III, LLC, actively and knowingly participated in the conspiracy alleged herein, colluded with others to fix tax lien interest rates, and purchased tax sale certificates in New Jersey.

18.     Defendant M.D. Sass Municipal Finance Partners – IV, LLC is a Delaware limited liability company with its principal place of business located in New York City, New York.  During the Class Period, M.D. Sass Municipal Finance Partners – IV, LLC actively and knowingly participated in the conspiracy alleged herein, colluded with others to fix tax lien interest rates, and purchased tax sale certificates in New Jersey.

19.     Defendant M.D. Sass Municipal Finance Partners – V, LLC is a Delaware limited liability company with its principal place of business located in New York City, New York.  During the Class Period, M.D. Sass Municipal Finance Partners – V, LLC actively and knowingly participated in the conspiracy alleged herein, colluded with others to fix tax lien interest rates, and purchased tax sale certificates in New Jersey.

20.     Defendant M.D. Sass Municipal Finance Partners- VI, LLC is a Delaware limited liability company with its principal place of business located in New York City, New York.  During the Class Period, M.D. Sass Municipal Finance Partners – VI, LLC actively and knowingly participated in the conspiracy alleged herein, colluded with others to fix tax lien interest rates, and purchased tax sale certificates in New Jersey.

21.     Defendant Isadore May is a citizen of New Jersey who at all relevant times resided in Margate City, New Jersey, actively and knowingly participated in the conspiracy alleged herein, colluded with others to fix tax lien interest rates, and purchased tax sale certificates in New Jersey.

22.     Defendant Richard J. Pisciotta, Jr. is a citizen of New Jersey who at all relevant times resided in Long Branch, New Jersey, actively and knowingly participated in the conspiracy alleged herein, colluded with others to fix tax lien interest rates, and purchased tax sale certificates in New Jersey.

23.     Defendant Stephen E. Hruby is a citizen of New Jersey who at all relevant times resided in Haineport, New Jersey, actively and knowingly participated in the conspiracy alleged herein, colluded with others to fix tax lien interest rates, and purchased tax sale certificates in New Jersey.   Defendant Hruby is believed to be a former executive of Defendant MD Sass Investors Services, Inc.

24.     Defendant Robert Rothman is a citizen of New York who at all relevant times resided in New York, New York, actively and knowingly participated in the conspiracy alleged herein, colluded with others to fix tax lien interest rates, and purchased tax sale certificates in New Jersey.

25.     Defendant William Collins is a citizen of New Jersey who at all relevant times resided in Medford, New Jersey, actively and knowingly participated in the conspiracy alleged herein, colluded with others to fix tax lien interest rates, and purchased tax sale certificates in New Jersey.

26.     Defendant David Farber is a citizen of New Jersey who at all relevant times resided in Cherry Hill, New Jersey and actively and knowingly participated in the conspiracy

alleged herein, colluded with others to fix tax lien interest rates, and purchased tax sale certificates in New Jersey. Defendant Farber owns a partnership interest in DSBD, LLC, a New Jersey company that purchased municipal tax liens, which were held by Defendants CCTS I, CCTS II and Crestar Capital, LLC.

27.     Defendant Robert Stein is a citizen of Pennsylvania who at all relevant times resided in Huntington Valley, Pennsylvania and actively and knowingly participated in the conspiracy alleged herein, colluded with others to fix tax lien interest rates, and purchased tax sale certificates in New Jersey. Defendant Stein conducts business under the fictitious name Crusader Lien Services, in conjunction with Defendant Royal Tax Lien Services.

28.     Defendant Royal Tax Lien Services LLC is a Pennsylvania limited liability corporation with its principal place of business located in Narberth, Pennsylvania. Defendant Royal Tax Lien Services LLC actively and knowingly participated in the conspiracy alleged herein, colluded with others to fix tax lien interest rates, and purchased tax sale certificates in New Jersey. Defendant Royal Tax Lien Services LLC conducts business both under its own name and under the fictitious name, Crusader lien Services, in conjunction with Defendant Robert Stein.

29.     Defendant Michael Fabrikant & Associates, Inc. is a New Jersey corporation with a principal place of business in Freehold, New Jersey. At all relevant times, Defendant Michael Fabrikant & Associates, Inc. actively and knowingly participated in the conspiracy alleged herein, colluded with others to fix tax lien interest rates, and purchased tax sale certificates in New Jersey.

30.     Defendant Royal Bank America is a Pennsylvania financial institution with its principal place of business located in Jenkintown, Pennsylvania and actively and knowingly

participated in the conspiracy alleged herein, colluded with others to fix tax lien interest rates, and purchased tax sale certificates in New Jersey.

31.     Defendant Royal Tax Lien Services, LLC is a Pennsylvania limited liability corporation with its principal place of business located in Narberth, Pennsylvania.  Defendant Royal Tax Lien Services is majority owned by Defendant Royal Bancshares of Pennsylvania, Inc.  Defendant Royal Tax Lien Services, LLC actively and knowingly participated in the conspiracy alleged herein, colluded with others to fix tax lien interest rates, and purchased tax sale certificates in New Jersey.

32.     Defendant Royal Bancshares of Pennsylvania, Inc. is a Pennsylvania corporation with its principal place of business in Narberth, Pennsylvania.  Defendant Royal Bancshares of Pennsylvania, Inc. actively and knowingly participated in the conspiracy alleged herein, colluded with others to fix tax lien interest rates, and purchased tax sale certificates in New Jersey.

33.     Defendant U.S. Bank N.A. is a nationally chartered bank with its principal place of business in Minneapolis, Minnesota.  The parent company of Defendant U.S. Bank N.A. is U.S. Bancorp, a Delaware corporation, with its headquarters in Minneapolis, Minnesota.  Defendant U.S. Bank N.A. actively and knowingly participated in the conspiracy alleged herein, colluded with others to fix tax lien interest rates, and purchased tax sale certificates in New Jersey.

34.     Upon information and belief, there are various other individuals and entities not yet named as defendants who participated as co-conspirators in the tax-lien big rigging scheme.

## FACTUAL ALLEGATIONS

**A.      Overview of New Jersey Tax Lien Sales**

35.     A municipal tax lien is a legal restriction on real (residential and commercial) property imposed by municipalities in New Jersey. New Jersey municipalities depend on the collection of property taxes and other assessments to fund the many services provided to residents.  Municipal governments would not be able to operate without the consistent collection of funds.   When owners of real property in New Jersey fail to pay real property, water or sewer taxes, the municipality in which the property is located may attach a lien.

36.     New Jersey's Tax Sale Law is set forth in N.J.S.A. 54:5-1 to 54:5-137. Municipalities may only collect these unpaid revenues by means provided by the Tax Sale Law. N.J.S.A. 54:5-6 states that delinquent taxes on real property shall operate as a continuous lien on the property, and all subsequent taxes, interest, penalties and costs of collection shall be added to and become part of such lien.  Important to investors, this lien is superior to all other interests on the real property, including any mortgage lien.

37.     The law requires all 566 municipalities to hold at least one tax sale per year (if the municipality has delinquent property taxes), at which time the municipality auctions off the delinquent tax obligations. *See* N.J.S.A. 54:5-19.   It is believed that New Jersey municipalities sell about $100 million in year in local tax debt on commercial and residential property. *See* Bloomberg News, "Tax Lien Executive from Hainesport latest to plead guilty in federal bid-rigging probe," www.NJ.com (4/17/12).

38.     All tax lien auctions are open to the public. Individuals, companies, banks and other financial institutions are all permitted to bid on available tax liens.

39.     The winning bidder must pay the outstanding property taxes to the municipality

and, in exchange, receives a "tax sale certificate," which must be recorded with the County in

which the property is located thereby giving the purchaser the right to receive/collect the

principal amount owed, as well as fees, interest and penalties.  Purchasers may earn more than 24

percent on their investment, as the maximum interest allowable is 18% and penalties of up to

6%, as well as fees provided for by statute, may be added to the amount owed by the property

owners.

40.     Bidders are supposed to bid competitively against one another on the amount of

interest that is collectable on the tax lien.  Pursuant to statute, bidding on the interest rate on the

lien starts at 18%. In a competitive market, interested purchasers bid against one another to bid

down the collectable interest rate on the lien.  Often times, the interest rates are bid down to 0%

and bidders offer premium payments to obtain the liens.  Even with a low interest rate, a

purchaser can collect penalties from the property owner, secure a first priority lien on the

property and institute foreclosure proceedings at an appropriate time.  The purchaser is also

entitled to priority for subsequent year tax liens on the property.

41.     The tax lien certificate represents a high-priority lien on the delinquent tax payer's

property, taking priority over just about every other lien, including an outstanding mortgage.

N.J.S.A. 54:5-9.  After two years, the winning bigger has the right to foreclose on the property

owner's right of redemption of the tax lien and take title to the property if the taxes owed on the

property, accrued interest, or any applicable costs or penalties remain unpaid.

42.     "Because property acquired [through foreclosure] can often be sold at a

significant profit over the amount paid for the lien, the auctions are marked by stiff competition.

As a result, most parcels attract multiple bidders willing to accept the lowest penalty

permissible—0%, that is to say, no [interest] at all." *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 642 (2008).

43.      In recent years, tax lien sales have proven to be a very lucrative investment opportunity.

**B.      Ongoing Criminal Investigation by the United States Department of Justice**

44.      The United States Department of Justice Antitrust Division ("DOJ") has been investigating allegations that bidders, including many of the above-named Defendants, have rigged sales at New Jersey tax lien auctions.  According to the DOJ, "the primary purpose of the conspiracy was to suppress and restrain competition, in order to obtain selected municipal tax liens offered at public auctions at non-competitive interest rates." *See* April 17, 2012 DOJ Press Release.

45.      To date, seven of the individuals have pleaded guilty to violating the federal antitrust laws, including, Stephen Hruby, Isadore May, Richard J. Pisciatta, Jr., Robert Rothman, William Collins, David Farber and Robert Stein.

46.      Defendant Hruby was a former executive of Defendant MD Sass Investors Services, Inc., who supervised the purchasing of municipal tax liens at auctions in New Jersey. According to the felony charge filed in the U.S. District Court for the District of New Jersey, from at least as early as December 2002 until approximately February 2009, Hruby participated in a conspiracy to rig bids at auctions for the sale of municipal tax liens in New Jersey by agreeing to, and directing others to, allocate among certain bidders which liens each would bid on.  Hruby, and those under his supervision, submitted bids in accordance with their agreements and purchased tax liens at collusive and non-competitive interest rates.  On April 17, 2012, Hruby pleaded guilty to violating the Sherman Act and is to be sentenced on July 30, 2012.

47.     Defendant Isadore May pleaded guilty on August 24, 2011 to violating the Sherman Act for his involvement in the conspiracy to rig bidding at municipal tax lien sale auctions in New Jersey.  According to the Information to which May pleaded guilty, from 2003 through February 2009, May and his co-conspirators entered into agreements to eliminate competition by submitting non-competitive and collusive bids at certain public auctions for tax lien sales in New Jersey.  May's sentencing is scheduled for August 13, 2012.

48.     Defendant Richard J. Pisciotta, Jr. pleaded guilty to violating the Sherman Act on August 24, 2011, for his involvement in the conspiracy to rig bidding at municipal tax lien sale auctions within New Jersey.  According to the Information to which Pisciotta pleaded guilty, from 2003 through February 2009, Pisciotta and his co-conspirators entered into agreements to eliminate competition by submitting non-competitive and collusive bids at certain public auctions for tax lien sales in New Jersey.  Pisciotta's sentencing is scheduled for August 13, 2012.

49.     Defendant Robert Rothman pleaded guilty to violating the Sherman Act on March 27, 2012, for his involvement in the conspiracy to rig bidding at municipal tax lien sale auctions within New Jersey.  According to the Information to which Rothman pleaded guilty, from Spring of 2000 through February 2009, Rothman and his co-conspirators entered into agreements to eliminate competition by submitting non-competitive and collusive bids are certain public auctions for tax lien sales in New Jersey.   Rothman's sentencing is scheduled for July 23, 2012.

50.     Defendant William Collins pleaded guilty to violating the Sherman Act on August 24, 2011, for his involvement in the conspiracy to rig bidding at municipal tax lien sale auctions within New Jersey.  According to the Information to which Collins pleaded guilty, from early 2003 to February 2009, Collins and his co-conspirators entered into agreements to eliminate

competition by submitting non-competitive and collusive bids are certain public auctions for tax lien sales in New Jersey.   Collin's sentencing is scheduled for August 13, 2012.

51.      Defendant David Farber pleaded guilty to violating the Sherman Act on February 23, 2012, for his involvement in the conspiracy to rig bidding at municipal tax lien sale auctions within New Jersey.  According to the Information to which Farber pleaded guilty, from December 2008 through July 2009, Farber and his co-conspirators entered into agreements to eliminate competition by submitting non-competitive and collusive bids are certain public auctions for tax lien sales in New Jersey.  According to the Information, Defendant Farber held a limited partnership interest in DSBD, LLC, a New Jersey company.  DSBD's role was to manage investments held by CCTS I and CCTS II, which meant DSBD oversaw CCTS I and CCTS II's acquisition of tax liens auctioned by municipalities located in New Jersey.  From 2005 until November 2008, pursuant to Farber's partnership interest in DSBD, Farber bid on and purchased municipal tax liens.  From December 2008 until July 2009, Farber served as President of DSBD and continued to oversee the purchase of municipal tax liens.  Farber's sentencing is scheduled for June 18, 2012.

52.      Defendant Robert Stein pleaded guilty to violating the Sherman Act on February 23, 2012, for his involvement in the conspiracy to rig bidding at municipal tax lien sale auctions within New Jersey.  According to the Information to which Stein pleaded guilty, from 1998 through February 2009, Stein and his co-conspirators entered into agreements to eliminate competition by submitting non-competitive and collusive bids are certain public auctions for tax lien sales in New Jersey.   The Information further provides that Stein was owner and President of a company and that from 1996 until November 2010, he oversaw the Company's purchase of tax sale certificates in New Jersey.  Stein's sentencing is scheduled for June 18, 2012.

**C.     Plaintiff's Lien Is Auctioned Off**

53.     On November 25, 2008, a tax sale was held in East Greenwich Township (the "Tax Sale").  A lien in the amount of $8,309.15 on Plaintiff English's Property was among the twenty one (21) liens auctioned off at the Tax Sale.  Plaintiff English and a number of Defendants attended the Tax Sale.

54.     On the date of the Tax Sale, but prior to bidding, Plaintiff English overheard a number of the Defendants discussing and agreeing to allocate between them, at the maximum interest rate, the liens offered for sale that day.

55.     As a direct result of Defendants' unlawful bid rigging, and despite the fact that there were 29 different bidders present at the Tax Sale, all liens auctioned off that day were sold at the maximum interest rate of 18%, without any competitive bidding.  Because 18% interest is the maximum rate allowed by law, and based on the discussions between the various Defendants, it is clear that only one bid was offered for each lien.

56.     Defendant CCTS Capital, LLC purchased Plaintiff English's tax lien for $8,309.15 after placing the sole bid for the lien at 18% interest.

57.     As a further direct result of Defendants' unlawful bid rigging, Plaintiff English was unable to redeem his tax lien, in part, due to the artificially inflated interest rate at which it was sold.  The interest on Plaintiffs' debt has continued to accumulate at a rate of 18% since the date of the Tax Sale.

58.     Evidence demonstrates that this unlawful bid rotation has occurred at many auctions in New Jersey.  In an interview with Bloomberg, one buyer admitted to the bid rotation scheme.  "'The sense was the list is long, we all know each other, there is no need to kill each other, so we'll just bid round-robin.' . . . [The buyer] said lien buyers sometimes followed that

practice at other New Jersey auctions . . . ."  David Glovin & David Voreacos, *New Jersey 'Round Robin' Tax Lien Auction Spurs Probe*, BLOOMBERG, Mar. 21, 2012, *at* http://www.bloomberg.com/news/2012-03-21/m-d-sass-participated-in-tax-lien-sale-being-probed-by-u-s-.html.

59.     The Defendants, along with others presently unknown, conspired and agreed to illegally eliminate competition in the bidding process, reaping substantial financial benefits for themselves to the detriment of Plaintiff English and other Class Members.

## CLASS ACTION ALLEGATIONS

**A.     Class Definitions**

60.     Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(b)(1)(A) and (B), b(2), and (b)(3), on behalf of the following proposed class (the "Class"):

> All persons who owned real property in the State of New Jersey
> and who had a tax lien associated with that real property sold at a
> municipal sales auction at any time from January 1, 1998 through
> the date of class certification and purchased by a Defendant, where
> the interest rate associated with that lien was greater than 0%.

Excluded from this Class are Defendants and their officers, affiliates, subsidiaries, directors and employees.

61.     The Class is so numerous that joinder of its members is impracticable.

62.     The exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery.

63.     The Class is ascertainable in that the names and addresses of all Class members can be identified in business records maintained by the Defendants.

64.     There are numerous questions of law and fact that are common to the claims of all Class members as set forth above, including:

(a)     Whether Defendants entered into a contract, combination or conspiracy to fix the price and other terms of municipal tax liens and to allocate bids for the sale of municipal tax liens;

(b)     Whether Defendants' contract, combination or conspiracy had the purpose and effect of reducing and unreasonably restraining competition in the market for redemption of municipal tax liens;

(c)     The identity of participants to the contract, combination or conspiracy;

(d)     The duration and extent of the contract, combination or conspiracy alleged in the Complaint;

(e)     The mechanisms used to accomplish the contract, combination or conspiracy;

(f)     Whether Defendants' conduct violated § 1 of the Sherman Act;

(g)     The effect upon and the extent of injuries sustained by Plaintiffs and Class members;

(h)     The appropriate type and/or measure of damages;

(i)     Whether injunctive relief is necessary to restrain future and continuing antitrust violations;

(j)     Whether Defendants engaged in mail and/or wire fraud;

(k)     Whether Defendants engaged in a pattern of racketeering activity;

(l)     Whether the Enterprise alleged herein is an enterprise within the meaning of 18 U.S.C. § 1961(4);

(m)     Whether Defendants conducted or participated in the conduct of the affairs of the Enterprises through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c);

(n)     Whether Defendants conspired to commit violations of the racketeering laws in violation of 18 U.S.C. § 1962(d);

(o)     Whether defendants overt and predicate acts in furtherance of a conspiracy and/or direct acts in violation of 18 U.S.C. 1962(c) proximately caused injury to Plaintiffs' and the Class members' business or property;

(p)     Whether Plaintiff and the Class are entitled to injunctive, declaratory and/or other equitable relief;

(q)     Whether Plaintiff and the Class are entitled to an award of attorneys' fees and expenses against Defendants; and

(r)     Whether Defendants violated RICO and state laws.

**B.     Rule 23(a)**

65.     The claims of the representative Plaintiff are typical of those of the Class he represents.

66.     His claims originate from the same illegal, fraudulent conspiracy on the part of Defendants and Defendants' acts in furtherance of that conspiracy, including Defendants' own fraudulent conduct, as well as conduct by Defendants that aided and abetted the fraudulent conduct of others.  Thus, if brought and prosecuted individually, the claims of each Class member would require proof of the same material and substantive facts.

67.     Plaintiff and Class members will seek the same relief.

68.     Plaintiff will fairly and adequately protect the interests of the Class and has no interest adverse to or which directly and irrevocably conflicts with the interest of other members of the Class.

69.     Plaintiff is willing and prepared to serve the Court and proposed Class in a representative capacity with all the obligations and duties material thereto.

70.     The interests of Plaintiff are co-extensive with and not antagonistic to those of the absent Class members.

71.     Plaintiff has retained the services of counsel who are experienced in complex antitrust and RICO class action litigation, will adequately prosecute this action, and will assert, protect and otherwise represent the Plaintiff and all absent Class members.

**C.     Rules 23(b)(1), 23(b)(2) and 23(b)(3)**

72.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) and (B).  The prosecution of separate actions by individual members of the Class would, as a practical matter, be dispositive of the interests of other members of the Class who are not parties to the action or could substantially impair or impede their ability to protect their interests.

73.     The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, by establishing incompatible standards of conduct for the parties opposing the Class.  Such incompatible standards of conduct and varying adjudications, on what would necessarily be the same essential facts, proof and legal theories, would also create and allow the existence of inconsistent and incompatible rights within the Class.

74.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) in that Defendants have acted or refused to act on grounds generally applicable to the Class, making final declaratory or injunctive relief appropriate.

75.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) in that the questions of law and fact that are common to the members of the Class predominate over any questions affecting only individual members.

76.     A class action is superior to other methods for the fair and efficient adjudication of the controversies raised in this Complaint in that:

    (a)     The concentration of litigation of these claims in one forum will achieve efficiency and promote judicial economy; and

    (b)     The proposed class action is manageable.

## FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

77.     Defendants affirmatively and fraudulently concealed their unlawful scheme, conspiracy and course of conduct from Plaintiff and the Class.

78.     Defendants have also engaged in an elaborate series of affirmative acts, including bid-rigging, to create the illusion of a competitive market.

79.     Defendants did not disclose their practices in any documents provided to Plaintiff and the Class.

80.     As a result of the foregoing, Plaintiffs and Class members could not reasonably discover from the Defendants or any other source the deceptive and anticompetitive practices and Plaintiffs did not do so until certain Defendants pleaded guilty to Sherman Act violations.

81.     Defendants' conduct is continuing in nature.  Defendants decided to engage in and conceal the scheme, conspiracy and course of misconduct alleged herein including, *inter*

*alia*, bid rigging and price fixing, over one decade ago.  Continuously thereafter, Defendants have continued to engage in and conceal their fraudulent scheme to fix the interest rates for municipal tax liens at 18%.

82.     There is a substantial nexus between the fraudulent and anticompetitive conduct. The acts involve the same type of illicit practices and are recurring, continuous events.

83.     The statutes of limitations applicable to any claims which Plaintiffs or other Class members have brought or could bring as a result of the unlawful and fraudulent concealment and course of conduct described herein have been tolled as a result of Defendants' fraudulent concealment.  In addition, Plaintiffs and the Class did not and could not have discovered their causes of action until the time at which an investigation was made, thereby tolling any applicable statute of limitations.

## VIOLATIONS ALLEGED

**FIRST CLAIM FOR RELIEF –**
**Violation of Section 1 of the Sherman Act, 15 U.S.C. 1**
**(On behalf of Plaintiff and the Class Against All Defendants)**

84.     Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

85.     Beginning in or about January 1998 and continuing to the present, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to suppress and eliminate competition, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by submitting non-competitive and collusive bids at public auctions for tax lien sales conducted by municipalities within the District of New Jersey.

86.     Defendants' and their co-conspirators' combination and conspiracy was an unreasonable restraint on interstate trade and commence in violation of Section 1 of the Sherman Act.

87.     The charged combination and conspiracy consisted of a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms of which were to rig bids for and allocate tax liens being auctioned by municipalities within the District of New Jersey.

88.     In order to carry out the conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including among other things:

(a)     Attended meetings and auctions, during which they engaged in discussions and conversations orchestrating and ordering bids for tax liens being auctioned by municipalities within the District of New Jersey.

(b)     Agreed during those meetings and auctions not to compete at certain tax lien auctions by allocating which tax liens each would bid on or refrain from bidding;

(c)     Submitted bids in accordance with the agreements reached; and

(d)     Purchased tax liens pursuant to those agreements at collusive and non-competitive interest rates.

89.     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff and Class Members have been injured by having to suffer artificially inflated interest rates, prices for redemption, and value forfeited in foreclosure associated with unpaid property tax liens.  The Defendants' bid rigging scheme had the following effects, among others:

(a)     Restraining and suppressing competition among the Defendants and their co-conspirators;

    (b)     Fixing interest rates at artificial, supra-competitive levels;

    (c)     Fixing the rates of redemption owed and/or paid by Plaintiff and Class Members to supra-competitive, elevated levels; and

    (d)     Depriving Plaintiffs and Class Members of the benefits of free and open competition in the municipal tax sales market.

90.     At all relevant times, the activities of the Defendant and its co-conspirators with respect to the sale of municipal tax liens that are the subject of this Complaint were within the flow of, and substantially affected, interstate trade and commerce as funds from outside the State of New Jersey were used by one or more of the co-conspirators to purchase tax liens at auctions subject to the conspiracy.  Additionally, out-of-state bidders participated in multiple tax lien sales or auctions in New Jersey and paid for tax liens won with out-of-state funds.

91.     At all relevant times, the activities of the Defendants and their co-conspirators with respect to the sale of municipal tax liens that are the subject of this Complaint were within the flow of, and substantially affected, interstate trade and commerce.

92.     As a direct and proximate result of the Defendants conduct, Plaintiff and Class Members were injured in their business or property in that they paid more or are required to pay more to satisfy their delinquent tax obligation and are or were required to redeem their liens at higher prices and on terms less favorable than would have existed in the absence of the conspiracy detailed herein.

### SECOND CLAIM FOR RELIEF
**Injunctive Relief Under Section 16 Of The Clayton Act For Defendants' Violations Of Section 1 Of The Sherman Act**
**(On behalf of Plaintiff and the Class Against All Defendants)**

93.     Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

94.    As alleged above, Defendants knowingly and willfully engaged in a course of conduct designed to unlawfully rig bids and allocate tax liens being auctioned by municipalities within the District of New Jersey in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

95.    Plaintiff and the other members of the Class have been injured in their business or property by reason of Defendants' antitrust violation alleged in this Count.  Their injury consists of paying more or being required to pay more to satisfy their delinquent tax obligation and having been or being required to redeem their liens at higher prices and on terms less favorable than would have existed in the absence of the conspiracy detailed herein.  The injury to Plaintiff and the Class is the type of injury antitrust laws were designed to prevent, and the injury flows from Defendants' unlawful conduct.  Plaintiff and members of the Class are threatened with further injuries as a result of Defendants' continuing scheme, including loss of real property through foreclosure and being required to pay inflated redemption rates to redeem their liens, as alleged herein.

96.    Plaintiff and the Class seek equitable and injunctive relief pursuant to  Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by the unlawful conduct of Defendants, and other relief so as to assure that similar anti-competitive conduct does not occur in the future.

### THIRD CLAIM FOR RELIEF
#### Violation of the New Jersey Antitrust Act, N.J.S.A. 56:9-3
#### (On behalf of Plaintiff and the Class Against All Defendants)

97.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

98.     Beginning in or about January 1998 and continuing to the present, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to suppress and eliminate competition in New Jersey in violation of N.J.S.A. 56:9-3.

99.     The contract, combination and conspiracy alleged herein consisted of a continuing agreements, understandings and concerts of action among the Defendants and their co-conspirators, the substantial terms of which were to rig bids for and allocate tax liens being auctioned by municipalities within the District of New Jersey.

100.    In order to carry out the conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including among other things:

(a)     Attended meetings and auctions, during which they engaged in discussions and conversations orchestrating and ordering bids for tax liens being auctioned by municipalities within the District of New Jersey;

(b)     Agreed during those meetings and auctions not to compete at certain tax lien auctions by allocating which tax liens each would bid on or refrain from bidding;

(c)     Submitted bids in accordance with the agreements reached; and

(d)     Purchased tax liens pursuant to those agreements at collusive and non-competitive interest rates.

101.    Defendants' conspiracy and actions taken pursuant thereto are in violation of Title 56, Chapter 9 of the New Jersey Statutes Annotated, in that they serve to restrain trade and unlawfully fix interest rates for tax liens being sold at auctions throughout New Jersey.

102.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff and Class Members have been injured by having to suffer artificially inflated interest rates,

prices for redemption, and the value forfeited in foreclosure associated with unpaid property tax

liens.  The Defendants' bid rigging scheme had the follow effects, among others:

      (a)     Restraining and suppressing competition among the Defendants and their

co-conspirators;

      (b)     Fixing interest rates at artificial, supra-competitive levels;

      (c)     Fixing the rates of redemption owed and/or paid by Plaintiff and the Class

Members to supra-competitive, elevated levels; and

      (d)     Depriving Plaintiff and Class Members the benefits of free and open

competition in the municipal tax market.

103.     As a direct and proximate result of the Defendants' conduct, Plaintiff and the

Class Members were injured in their business or property in that they paid more or are required

to pay more to satisfy their delinquent tax obligation and are or were required to redeem their

liens at higher prices and on terms less favorable than would have existed in the absence of the

conspiracy detailed herein.

## FOURTH CLAIM FOR RELIEF –
## VIOLATION OF 18 U.S.C. § 1962(c)
### Racketeer Influenced and Corrupt Organizations Act
### (On Behalf of Plaintiff and the Class Against All Defendants)

104.     Plaintiff realleges and incorporates by reference all prior paragraphs of this

Complaint as if fully set forth herein.

105.     This action is brought under 18 U.S.C. § 1964(c) for violation of 18 U.S.C. §

1962(c).

106.     At all times material to this Complaint, the Defendants and their co-conspirators

were "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

107.    As more fully set forth below, the Defendants and their co-conspirators conducted, or participated in the conduct of the affairs of an association-in-fact enterprise, through a pattern of racketeering activity, specifically acts of mail and wire fraud.

### The Bid Rigging Enterprise

108.    The Defendants and their co-conspirators had an ongoing and continuing business organization that operated from approximately January 1998 through at least 2008 and consisted of the Defendants, their co-conspirators, and senior management personnel from each of the Defendant companies, including Defendants Richard J. Pisciotta, Jr., Stephen E. Hruby, Robert Rothman, William Collins, David Farber and Robert Stein (the "Bid Rigging Enterprise").  The Bid Rigging Enterprise constituted an association-in-fact "enterprise" as the term is defined in 18 U.S.C. §§ 1961(4) and 1962(c).

109.    The companies and individuals that constitute the Bid Rigging Enterprise were associated for the common purpose of unlawfully profiting from the redemption of municipal tax liens by fixing the rates of interest for the redemption of such liens and by allocating bids at tax lien sales.

110.    The Defendants and their co-conspirators formed the Bid Rigging Enterprise to unlawfully obtain maximum profits by refusing to bid against one another at municipal tax lien sales.  Because there was no competition for bids, each municipal tax lien was sold with the maximum 18% interest rate.  Each of the Defendants and their co-conspirators was able to maximize its profit by conspiring to not compete against one another for municipal tax liens, thus fixing the interest rates earned on such liens at artificially inflated levels.

111.    Because it was impossible for the Defendants and their co-conspirators to realize the anticompetitive profits they sought on municipal tax liens through legitimate means, the

Defendants, their co-conspirators and other key management personnel from these companies, combined to form the association-in-fact Bid Rigging Enterprise through which they coordinated to unlawfully fixed prices of delinquent tax obligations in New Jersey.  The role of each RICO Defendant and their co-conspirators in the Bid Rigging Enterprise was to (1) coordinate and organize a bid rotation scheme to utilize at each municipal tax sale auction it attended; (2) to persuade bidders who may not be members of the Enterprise to agree to a bid rotation scheme; and (3) to utilize the devised bid rotation scheme at each municipal tax sale auction it attended.

112.    Each of the Defendants and their co-conspirators conducted and/or participated in the conduct of the affairs of the Enterprise as described in this Complaint.  Specifically:

(a)    Restraining and suppressing competition among the Defendants and their co-conspirators;

(b)    Fixing interest rates at artificial, supra-competitive levels;

(c)    Fixing the rates of redemption owed and/or paid by Plaintiff and the Class Members to supra-competitive, elevated levels; and

(d)    Depriving Plaintiff and Class Members the benefits of free and open competition in the municipal tax market.

### Defendants' Use of the United States Mails and Interstate Wire Facilities

113.    The Defendants' and their co-conspirators' illegal conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, information and funds by United States mail and interstate wire facilities.

114.    A number of the Defendants are located outside of the state of New Jersey and therefore it was necessarily required that management personnel within New Jersey

communicate directly and frequently by the United States mails and interstate wire facilities with Defendants in other states, as well as with property owners whose property was subject to municipal tax liens purchased by the Defendants and their co-conspirators in New Jersey.

115.    Many of the precise dates of the Defendants' and their co-conspirators' uses of the United States mails and interstate wire facilities (and corresponding acts of mail and wire fraud) cannot be alleged without access to the Defendants' books and records.  Nevertheless, Plaintiff can describe specific occasions on which RICO predicate acts of mail fraud and wire fraud occurred, and explain how those acts were in furtherance of the bid rigging scheme, as set forth below:

(a)     Within 10 days of the sale of each municipal tax lien by the subject municipality, the municipal tax collector is required by law to send lien purchasers Tax Sales Certificates, detailing the terms of the lien.  N.J.S.A. 54:5-49.

(b)     On October 20, 2009, Plaintiff obtained a Lien Maintenance Statement by wire from the lien holder showing that Plaintiffs' debt had increased substantially, in part due to the 18% interest, penalties and fees.

116.    The Defendants and their co-conspirators received money—the wrongful proceeds of the bid rigging and price fixing scheme—sent by United States mails and interstate wire facilities on thousands of occasions (*e.g.*, each time a Class member redeemed a lien owned by Defendants and each time a lien holder foreclosed on a property in satisfaction of a lien).

## The Defendants' Pattern of Racketeering Activity

117.    The Defendants and their co-conspirators conducted and participated in the affairs of the Bid Rigging Enterprise through a pattern of racketeering activity, including the above-described acts, that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. §

1343, relating to wire fraud.  The Defendants and their unnamed co-conspirators engaged in thousands of separate uses of the United States mails or interstate wire facilities in furtherance of their scheme.  Each of these mailings and interstate wire transmissions constitute "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B).  The last act of racketeering activity occurred within ten years of prior acts of racketeering activity.  Collectively, these violations constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5), by which the Defendants and their co-conspirators intended to defraud Plaintiff, members of the Class and other intended victims of the scheme.

118.    The Defendants and their co-conspirators engaged in this fraudulent and unlawful bid rigging and price fixing scheme so that they could reap massive unlawful profits.  The scheme was calculated and intentionally crafted and designed to require that Plaintiff and members of the Class would make overpayments for their delinquent tax obligations.  In designing and implementing the scheme, the Defendants and their co-conspirators were at all times aware that Plaintiff and members of the Class would be required to pay artificially elevated rates of interest due to their fraudulent scheme.  By intentionally and systematically misrepresenting that competition was occurring, when in fact, no competition existed, and thereby artificially and illegally maximizing their profits, the Defendants and their co-conspirators engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

119.    The Defendants' and their co-conspirators' racketeering activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive Plaintiff and members of the Class.  Each separate use of the United States mails or interstate wire facilities employed by the Defendants and their co-conspirators was related, had similar intended

purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiffs and members of the Class. The Defendants engaged in the pattern of racketeering activity for the purpose of conducting the business affairs of the Bid Rigging Enterprise.

## The Defendants' Motive

120.   The Defendants' and their co-conspirators' motive for participating in the affairs of the Bid Rigging Enterprise was to collect at least hundreds of millions of dollars in additional annual profits by artificially fixing interest rates owed on delinquent tax obligations at 18%, thereby causing Plaintiff and the Class members to be required to pay higher prices to redeem their delinquent tax obligations.

## Damages Caused by the Bid Rigging Scheme

121.   The Defendants' and their co-conspirators' violations of federal law and its pattern of racketeering activity have directly and proximately caused Plaintiff and members of the Class to be injured in their business and property because Plaintiff and members of the Class have paid or are required to pay at least hundreds of millions of dollars for artificially inflated interest rates to redeem their delinquent tax obligations.

## FIFTH CLAIM FOR RELIEF – VIOLATION OF N.J.S.A. 2C:41-2(c) Racketeer Influenced and Corrupt Organizations Act (On behalf of Plaintiff and the Class Against All Defendants)

122.   Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

123.   This action is brought under N.J.S.A. 2C:41-4 for violation of N.J.S.A. 2C:41-2(c).

124.    As described herein and at paragraphs 104-21, the Bid Rigging Enterprise constituted an association-in-fact "enterprise" as the term is defined in N.J.S.A. 2C:41-1.

125.    As described herein and at paragraphs 104-21, from approximately 1998 through 2008, the Defendants conducted and participated in the affairs of the Bid Rigging Enterprise through a pattern of racketeering activity, as defined under N.J.S.A. 2C:41-1 and indictable under N.J.S.A. 2C:41-2(c).

### SIXTH CLAIM FOR RELIEF
### Unjust Enrichment
### (On behalf of Plaintiff and the Class Against All Defendants)

126.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

127.    As a result of the unlawful conduct described above, Defendants have been unjustly enriched by collecting unlawfully inflated interest amounts associated with each purchase of tax liens.

128.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of their ill-gotten gains.

129.    Plaintiff and members of the Class are entitled to recover the amount of Defendant's ill-gotten gains resulting from their unlawful, unjust and inequitable conduct.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants and in favor of Plaintiff and the Class and award the following relief:

1.    Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23, appointing Plaintiff as the class representative and designating Plaintiff's Counsel as counsel for the Class;

2.      Adjudge and decree the acts alleged herein to be unlawful;

3.      Award the Plaintiff and the Class damages in an amount to be determined at trial;

4.      Award the Class threefold damages pursuant to 18 U.S.C. § 1964(c) and 15 U.S.C. § 15(a), N.J.S.A. 56:8-2 *et seq.*, and N.J.S.A. 2C:41-1 *et seq.*;

5.      Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees as provided by law;

6.      Award restitution and/or disgorgement of Defendant's ill-gotten gains;

7.      Enter judgment declaring that Defendant must cease the activities described herein,

8.      Enjoin each Defendant from engaging in the unlawful conduct described herein; and

9.      Grant such other further relief as is necessary to correct the anticompetitive market effects caused by the Defendants' unlawful conduct as the Court deems just.

### JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiff on behalf of himself and the proposed Class, demands a trial by jury on all issues so triable.

DATED: May 2, 2012           Respectfully submitted,

TRUJILLO RODRIGUEZ & RICHARDS, LLC

BY:  *s/ Lisa J. Rodriguez*
      *s/ Nicole M. Acchione*
Lisa J. Rodriguez
Nicole M. Acchione
258 Kings Highway East
Haddonfield, N.J. 08033
(856) 795-9002
lisa@trrlaw.com
nacchione@trrlaw.com

TRUJILLO RODRIGUEZ & RICHARDS, LLC
Ira N. Richards
1717 Arch Street, Suite 3838
Philadelphia, PA 19103
(215) 731-9004
ira@trrlaw.com

CAFFERTY FAUCHER LLP
Bryan L. Clobes
Ellen Meriwether
Kelly L. Tucker
1717 Arch Street, Suite 3610
Philadelphia, PA 19103
(215) 864-2800
bclobes@caffertyfaucher.com
emeriwether@caffertyfaucher.com
ktucker@caffertyfaucher.com

LAW OFFICE OF DANIEL MCCORMACK
Daniel McCormack, Esq.
403 S. White Horse Pike
Audubon, N.J. 08106
(856) 546-3999
d.mccormack@verizon.net

SHABEL & DENITTIS, P.C.
Stephen P. DeNittis
5 Greentree Centre, Ste. 302
Marlton, New Jersey 08053
(856) 797-9951
sdenittis@shabeldenittis.com